585 So.2d 334 (1991)
Mark K. STRALEY, Appellant,
v.
Stacy FRANK, Appellee.
Nos. 89-3505, 90-1546.
District Court of Appeal of Florida, Second District.
July 31, 1991.
Rehearing Denied as Moot September 19, 1991.
*335 Raymond A. Alley, Jr., Tampa, for appellant.
Susan Latham Steffey and Stephen W. Sessums, of Sessums & Mason, P.A., Tampa, for appellee.

ON MOTION FOR REHEARING EN BANC
PER CURIAM.
Pursuant to motion of the appellant, Mark K. Straley, this case has been considered en banc in order to maintain consistency in the case law of the Second District Court of Appeal, for whom we have been appointed to sit by order of the Chief Justice of the Florida Supreme Court. We withdraw the opinion issued herein on October 11, 1990 by the three-judge panel and substitute therefor the following:
The trial court below, based on an apparent misconstruction of the law of equitable distribution, inequitably distributed the assets and liabilities of the parties to the instant dissolution action, Mark Straley and Stacy Frank. In several instances the court failed to properly distinguish between marital and premarital assets, and violated tenets set forth by the Florida Supreme Court in Ball v. Ball, 335 So.2d 5 (Fla. 1976) and Landay v. Landay, 429 So.2d 1197 (Fla. 1983), and by the Florida Legislature in section 61.075, Florida Statutes (1989).
Straley and Frank are both attorneys. They were married in 1984 and separated four years later in 1988. Since Straley had practiced law six years longer than his wife, he entered the marriage with more assets. He placed these assets into joint names with his wife for the purpose, according to his trial testimony, of estate planning and loan refinancing. No testimony was presented by Frank that a gift of Straley's premarital assets was made to her.
Frank fared very well at the hands of the trial court. She entered this four-year, *336 childless, two-career marriage with roughly $9,000.00 in assets and an embryonic law practice that was not producing income. She exited the marriage with approximately $150,000.00 in assets, no liabilities, and an annual income of $54,350.00 from her legal employment. Indeed, the trial court awarded Frank more assets than she asked for in open court at trial. Straley, on the other hand, was denied all special equity claims and was ordered by the trial court to pay some $195,000.00 in debts, fees, and costs exclusive of his own attorney fees and costs. The trial court ordered Straley to pay $111,006.00 in unsecured marital debts, a fee for Frank's attorney in the amount of $71,706.50, and her costs of $12,836.32. Straley also incurred a personal attorney fee of $25,000.00 and costs of his own in the amount of $13,280.85. Therefore, his aggregate indebtedness, after judgment, was almost $234,000.00.
In support of the result reached by the trial court, an argument has been advanced (by the original panel and Frank's counsel at oral argument) which repudiates the Florida Supreme Court case of Ball, a venture not yet undertaken by the Florida Supreme Court itself. The rationale employed by the anti-Ball argument is that the enactment of section 61.075(3)(a)5, which became effective on October 1, 1988, has nullified Ball and placed upon the claimant to a special equity in jointly titled property a two-fold burden of proof: (1) to demonstrate that the property was derived from a non-marital source and (2) to negate the intendment of gift to the other spouse.[1] Given this interpretation, of course, a trial court's denial of special equity in jointly titled property can never be successfully challenged on appeal.
In Ball, the Florida Supreme Court wrote:
The premise that record title bespeaks an equal division is, of course, only the starting point for a property division. Either spouse has the right to attempt to establish a "special equity" in the realty by reason of his or her extraordinary contribution toward its acquisition, either financially or through personal industry and service to the other party. The other party, of course, can negate the attempted showing or affirmatively attempt to show that a gift was intended. We are not now called upon to determine the range of circumstances which might create a special equity. Consistent with prior decisional law, however, we hold that a special equity is created by an unrebutted showing, as was developed here, that all of the consideration for property held as tenants by the entireties was supplied by one spouse from a source clearly unconnected with the marital relationship. In these cases the property should be awarded to that spouse, as if the tenancy were created solely for survivorship purposes during coverture, in the absence of contradictory evidence that a gift was intended.
The enactment of section 61.075(3)(a)5 is nothing more nor less than a simplified codification of the Ball doctrine itself. Jointly titled property is presumed to be a marital asset. If one spouse claims a special equity in such property, that spouse has the burden of proof to support the claim. The spouse meets that burden, as explained in Ball, by an unrebutted showing that he or she furnished all of the consideration for the property from a source clearly unconnected with the marital relationship. Thereupon, that spouse is entitled to an award of the claimed special equity "in the absence of contradictory evidence that a gift was intended." Ball at 7. That contradictory evidence, of course, is the burden of the other spouse, who is relying on the nominal joint title in opposing the special equity.
*337 Contrary to the anti-Ball argument, nothing in section 61.075(3)(a)5 purports to undo the "no gift" presumption involved in Ball. That presumption, created by the claimant's unrebutted proof (of a non-marital source) is not encompassed by the new statute. Nothing in the statute itself  indeed, nothing in the statute's legislative history or the committee staff reports relating to it  so much as mentions Ball or any intent to revise it or recede from it. Surely, if the Florida Legislature had intended such a significant change in the domestic law of Florida, it would have done so in an explicit and unmistakable fashion. That is not the case.
Several treatises have considered the effect of the statute on prior case law. In Florida Dissolution of Marriage § 15.18 (3d ed. 1990), the author states that a spouse seeking to prove a special equity in property obtained prior to the marriage will presumably have to go through the same process as under prior law, citing to Ball, and notes that Ball is still cited as the standard for determining a special equity. §§ 15.18, 16.9. In section 16.17, the author reaffirms that there is no longer a presumption of a gift. Similarly, in an article published in The Florida Bar Journal shortly after the statute was enacted, Boyer and Ramers, Equitable Distribution in Florida: Redistributing the Bundle of Rights and Responsibilities, 62 Fla.B.J. 31 (1988), the authors continue to cite to Ball v. Ball, noting that under the statute, jointly held property becomes non-marital in whole or in part when one spouse's special equity claim overcomes the presumption that it is marital property.
To claim a special equity, a spouse must prove he contributed services or funds toward a specific, tangible property ... For the most part, a special equity arises when one contributes funds from a source unconnected with the marital relationship. [footnote citing to Ball v. Ball omitted]. The non-contributing spouse rebuts by showing his spouse intended to make a gift to him when she put the property in joint names.
Id. Thus, it appears that these commentators do not see the statute as overruling Ball or the "no gift" presumption.
The anti-Ball argument also contravenes prior case law from the Second District Court of Appeal. See, e.g., Davis v. Carr, 554 So.2d 669 (Fla. 2d DCA 1990) (wherein the court followed the Ball formula in reversing a trial court that denied a special equity in the face of uncontradicted testimony that certain assets were traceable to a premarital source) and Miceli v. Miceli, 533 So.2d 1171 (Fla. 2d DCA 1988) (wherein the court stated that section 61.075 is "essentially" a codification of existing case law). The 1988 statutory enactment was relevant to these decisions since an appellate court is generally required to apply the law in effect at the time of the disposition of the appeal. Cantor v. Davis, 489 So.2d 18 (Fla. 1986); Florida Patient's Compensation Fund v. Von Stetina, 474 So.2d 783 (Fla. 1985); Hall v. Billy Jack's, Inc., 458 So.2d 760 (Fla. 1984), rev. denied, 491 So.2d 279 (Fla. 1986).
Cases from district courts of appeal other than the Second that have been decided since enactment of the new equitable distribution statute also have continued to apply the Ball doctrine in deciding special equity issues. See, e.g., Robertson v. Robertson, 569 So.2d 852 (Fla. 4th DCA 1990); Milton v. Milton, 567 So.2d 477 (Fla. 1st DCA 1990); Martinez v. Martinez, 573 So.2d 37 (Fla. 1st DCA 1990); Hoffman v. Hoffman, 552 So.2d 958 (Fla. 1st DCA 1989), appeal dismissed, 558 So.2d 18 (Fla. 1990); Rouer v. Rouer, 548 So.2d 848 (Fla. 3d DCA 1989); and Della-Giustina v. Della-Giustina, 546 So.2d 1146 (Fla. 4th DCA 1989). None of these cases considered the 1988 enactment of section 61.075 to be a modification of the Ball doctrine. The absence of such consideration clearly indicates that no other court has even flirted with the innovative concept urged upon us in the instant case.
On appeal Straley challenges as inequitable the trial court's determination and distribution of marital assets and liabilities. Those assets include, inter alia, the following real and personal property: Straley's interest in two speculative real estate investment *338 partnerships owned prior to marriage (601 South Florida Avenue Land Trust and Harbor Property Associates);[2] a 21-foot Mako motorboat which was titled in the name of Straley and Frank as tenants in common prior to marriage; two lots on Palm Island in Charlotte County purchased by Straley prior to marriage; with a $15,000.00 down payment (the beach property); a vacation home built on the beach property during marriage at a cost of approximately $35,000.00; Straley's premarital furniture, subsequently placed in the beach house; a 40-foot sailboat known as the Evtide purchased during marriage and requiring costly restoration efforts; and the marital home located on Bayshore Boulevard in Tampa and the furniture therein, financed in part by the sale of a house on Bristol Avenue owned prior to marriage by Frank.
We find that the trial court erred in numerous particulars in fashioning its "equitable distribution" so as to require reversal and remand for a new trial on the determination and distribution of marital assets and liabilities. Initially, we observe that the trial court erred in characterizing the passive appreciation in market value of Straley's interest in non-marital real estate partnerships (601 and Harbor property) as a marital asset. See Wright v. Wright, 505 So.2d 699 (Fla. 5th DCA 1987). Section 61.075(3)(a)2 defines "marital assets and liabilities" as including "the enhancement in value and appreciation of non-marital assets resulting either from the efforts of either party during the marriage or from the contribution to or expenditure thereon of marital funds or other forms of marital assets... ." In this case, any increase in market value did not result from the expenditure of marital funds or from marital efforts, but resulted from "inflation or fortuitous market forces." Wright at 700. Any expenditure of marital funds on maintenance of these non-marital assets did not transform the appreciated asset into a marital asset. See Macaluso v. Macaluso, 523 So.2d 615, 616 (Fla. 2d DCA), rev. denied, 531 So.2d 1354 (Fla. 1988); Rion v. Rion, 421 So.2d 541, 543 (Fla. 5th DCA 1982); see also, Hanks v. Hanks, 553 So.2d 340, 342-343 (Fla. 4th DCA 1989). The appreciation in value of these two partnerships as a result of the infusion of marital funds was the amount by which Straley's share of the mortgage debt on 601 and Harbor property was reduced during marriage. Straley should have been debited with one-half of that amount, a sum of $4,347.50. See Landay, supra.
It is clear that the trial court erred in summarily denying Straley's claim to a credit for one-half the value of the Mako motorboat, which was his interest at the time of marriage. This error was candidly conceded at oral argument by counsel for Frank. We would agree, however, that the evidence in regard to Straley's assertion of a special equity in the sailboat, the Evtide, was confusing and conflicting and the denial of that special equity claim was not error.
The trial court also erred in denying Straley's claim to a special equity in the beach property, which was purchased by him prior to marriage with a $15,000.00 down payment. There was no evidence of a gift of this equity to Frank. Moreover, there was no "equity" in the trial court's assignment of all of the marital debt to Straley and none of it to Frank. As pointed out in the appellant's brief:
The inequity of the trial court's plan of equitable distribution is apparent on its face. Having entered the marriage with few assets and having contributed comparatively little to the acquisition of marital assets, the wife leaves the marriage with a 1987 Jeep Wagoneer automobile and a 21 foot Mako motor boat (both fully paid for), the beach property (with $52,000.00 in equity, and the most coveted marital asset), a boat condominium slip (with nearly $10,000.00 in equity), a $7,700.00 gemstone, and over $22,000.00 in cash, including $13,000.00 in lump sum *339 alimony. In addition, the Wife received virtually all of the personalty from both marital residences, as well as a 50% beneficial interest in 238 Franklin, and was relieved of any responsibility for $111,000.00 of marital debt.
In view of the fact that neither party to this dissolution action desires to retain any marital asset except the beach property, the trial court may have been on safer ground had it granted partition of all marital property and evenly divided the proceeds, together with the liabilities.
The award of attorney fees below is reversed in toto. There was no showing below that the wife lacked the present ability to pay substantial attorney fees. The evidence was exactly to the contrary. The wife is an attorney with no dependents and no liabilities, earning in excess of $50,000.00 per year. Even her one-half interest in the parties' two boats had a value in excess of $50,000.00. The purpose of section 61.16, Florida Statutes (1989), providing for assessment of attorney fees by the trial court after consideration of the financial resources of the parties, is to "compel the trial court to mitigate the harm an impecunious spouse would suffer where the other spouse's financial advantage accords him or her an unfair ability to obtain legal assistance." Nichols v. Nichols, 519 So.2d 620, 621-622 (Fla. 1988); see also, Cummings v. Cummings, 330 So.2d 134 (Fla. 1976). There is no reasonable basis in this record for finding that Frank was at a financial disadvantage in obtaining legal assistance.
We reverse and remand for a new trial on the issue of equitable distribution of assets and liabilities, applying the principles enunciated in Ball and its progeny, Landay. Neither party should be awarded attorney fees.
REVERSED AND REMANDED FOR NEW TRIAL.
DAUKSCH, COBB, COWART, HARRIS and PETERSON, JJ., concur.
DIAMANTIS, J., concurs in part, dissents in part with opinion.
W. SHARP, J., dissents with opinion, with which GOSHORN and GRIFFIN, JJ., concur.
DIAMANTIS, Judge, concurring in part and dissenting in part.
I concur in the majority opinion except as to the matter of attorney's fees, on which I respectfully dissent. In my view, the approach taken by the majority is inconsistent with the ruling in Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980), and with the provisions of section 61.16 of the Florida Statutes (1989), which provide that the court may, after considering the financial resources of both parties, order a party to pay reasonable attorney's fees.
We sit en banc in this case as associate judges of the Second District Court of Appeal, to use the words of the majority "in order to maintain consistency in the case law of the Second District Court of Appeal ..." However, on the issue of attorney's fees the majority not only fails to maintain consistency but causes confusion on the status of the attorney's fees issue in the Second District. On remand, I would instruct the trial court to award a reasonable partial attorney's fee to the wife after taking into consideration not only the respective income production of the parties and their respective net worth after retrial but also the reasonable time necessary to adequately represent the wife at the reasonable prevailing market rate.
Under the applicable Second District authority, if one party's earning ability or net worth is substantially greater than that of the other party, the latter may be awarded attorney's fees. Lochridge v. Lochridge, 526 So.2d 1010 (Fla. 2d DCA 1988); Blackburn v. Blackburn, 513 So.2d 1360 (Fla. 2d DCA 1987). In Lochridge, the Second District held that the trial court did not abuse its discretion in awarding attorney's fees to the wife, who had a net worth after equitable distribution of slightly in excess of $1,000,000. In Lochridge, the husband's net worth and income were substantially greater than that of the wife and his long-time record of income production and his *340 earning abilities were substantially superior to those of the wife.
The Second District's view is consistent with the Florida Supreme Court's holding in Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980):
The final issue presented to us is whether the award of the wife's attorney's fees, to be determined at a subsequent hearing, was error. In Cummings v. Cummings, 330 So.2d 134, 136 (Fla. 1976), we cited Mertz v. Mertz, 287 So.2d 691 (Fla. 2d DCA 1973), as correctly stating that the purpose of section 61.16, Florida Statutes, was to ensure that both parties will have similar ability to secure competent legal counsel. Without question, the financial positions of the parties in this proceeding are not the same. The husband has a superior financial ability to secure and pay counsel. It is not necessary that one spouse be completely unable to pay attorney's fees in order for the trial court to require the other spouse to pay these fees. Given the complexity of the cause and the time necessary to appropriately resolve the issues, the award of attorney's fees in this case was proper to avoid an inequitable diminution of the fiscal sums granted the wife in these proceedings. (emphasis added).
Id., at 1204-1205.
Nichols v. Nichols, 519 So.2d 620 (Fla. 1988) does not limit the award of attorney's fees to "an impecunious spouse" as the majority unfortunately suggests. Nichols neither limits nor modifies the Canakaris concept of awarding attorney's fees. The factual scenario in Nichols involved the situation of awarding temporary attorney's fees to an impecunious spouse even though that spouse failed to demonstrate any lack of ability to be represented by counsel during the dissolution proceedings.
The Canakaris concept of awarding attorney's fees is alive and well. For example, in Werner v. Werner, 16 F.L.W. D1447 587 So.2d 473 (Fla. 3d DCA May 28, 1991), the Third District followed Canakaris:
Next, we consider the wife's contention that the trial court erred in ordering the parties to pay their own attorney's fees and costs. We agree with her assertion. "It is not necessary that one spouse be completely unable to pay attorney's fees in order for the trial court to require the other spouse to pay these fees." Canakaris v. Canakaris, 382 So.2d 1197, 1205 (Fla. 1980). Because the husband's financial ability is superior to the wife's financial ability, the court should have ordered him to pay her fees. Martinez-Cid v. Martinez-Cid, 559 So.2d 1177 (Fla. 3d DCA 1990); Kuse v. Kuse, 533 So.2d 828 (Fla. 3d DCA 1988); Pappas v. Pappas, 489 So.2d 1242 (Fla. 3d DCA 1986); Kane v. Kane, 469 So.2d 933 (Fla. 3d DCA 1985); Angelides v. Angelides, 466 So.2d 1198 (Fla. 3d DCA 1985). (emphasis added).
Id., 587 So.2d at 474.
In the instant case, the husband earns approximately $113,000 a year while the wife earns $54,000 a year. Consequently, I cannot say that the trial court abused its "broad discretion" in doing equity between the parties by awarding the wife attorney's fees. However, a partial attorney's fee award to the wife would be equitable under the facts of this case after taking into consideration the respective earning ability and net worth of each party after this matter has been retried and the trial court has equitably distributed the parties' property. After retrial, the trial court will be in the better position to determine the extent of the partial award to the wife.
Any partial attorney's fees award must be based upon the time which is reasonable and necessary to adequately represent the wife. As the court in Matusow v. Matusow, 498 So.2d 462 (Fla. 3d DCA 1986) observed:
We also recognize that in many instances counsel that represent a wife in domestic litigation may spend much time and effort that is unnecessary or does not contribute to the resolution of the domestic litigation. The wife may be obligated to her attorneys for the work expended on her behalf in its entirety, but the husband under his agreement to pay fees should only be required to pay *341 those fees reasonably and necessarily incurred in representing a party in the domestic litigation.
Id., at 463 (citations omitted).
The instant case involves a highly acrimonious dissolution which has resulted in very protracted litigation. The trial court should determine whether the wife or the husband or both parties are responsible for unduly prolonging this matter and, if so, should adjust the hours reasonably necessary to adequately represent the wife because of this factor.
The attorney's fees in this case must also be based upon the prevailing market rate; that is, the rate charged in the community by attorneys of reasonably comparable skill, experience, and reputation for similar services. Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145, 1151 (Fla. 1985), modified, Standard Guarantee Insurance Co. v. Quanstrom, 555 So.2d 828 (Fla. 1990). The factors in determining a reasonable fee are set forth in Rule 4-1.5, Rules Regulating the Florida Bar, and adopted by the Florida Supreme Court. Quanstrom, 555 So.2d at 830. However, I emphasize that one of those factors is the fee customarily charged in the locality for similar legal services. Although this is one of the eight enumerated factors of Rule 4-1.5,[1] the trial court, under the facts of this acrimonious dissolution, must be diligent in seeing that the hourly rate is set at the prevailing market rate and not at the highest rate charged in the relevant market which may have occurred in the initial award of attorney's fees.
Because the initial award of attorney's fees to the wife exceeded $71,000, I am compelled to reiterate that the setting of attorney's fees is very important to the administration of justice and especially so in dissolution proceedings and that it is the responsibility of the bar and the bench to be ever mindful of unnecessary legal expenses in the litigation of contested dissolution matters. Rowe, 472 So.2d at 1149-1150; Katz v. Katz, 505 So.2d 25, 26 (Fla. 4th DCA 1987). The bar and the bench should always be mindful of the fact that the highly emotional character of contested dissolution matters causes parties to expend ever increasing hours on an expanding geometric ratio to the emotion involved, resulting in dissipation of the parties' accumulated assets. This unfortunate practice "resulting in a species of social malpractice that undermines the confidence of the public in the bench and bar." Rowe, 472 So.2d at 1149-1150, quoting Baruch v. Giblin, 122 Fla. 59, 63, 164 So. 831, 833 (Fla. 1935).
W. SHARP, Judge, dissenting.
We respectfully dissent. We would affirm the trial court's equitable distribution award of the marital assets in this case (appeal # 89-3505); reverse the award of all the former wife's (Stacy Frank's) attorney's fees and costs against the husband (appeal # 90-1546); and remand for further proceedings to apportion only part of the *342 attorney's fees and costs against the former husband (Mark Straley).

I. DISALLOWANCE OF SPECIAL EQUITY
The trial court disallowed the special equity claimed by Mark in the beachfront lots and two boats, not because of any anti-Ball[1] theory  as is asserted by the majority opinion  but because the trial judge thought the evidence and testimony below established that Mark and Stacy intended to make mutual gifts to one another of their assets owned prior to marriage. The trial court's findings on this issue should be affirmed by the appellate court if there is sufficient evidence to sustain the trial court's findings regardless of which party had the burden of proof on the special equity issue. Marsh v. Marsh, 419 So.2d 629 (Fla. 1982).
We submit there was sufficient evidence in this case. Prior to the parties' four-year marriage, Mark owned a home on Jetton Avenue in Tampa. He sold this property, and moved in with Stacy. They occupied her home on Bristol Avenue, in Tampa. With some of the proceeds from the Jetton house, Mark purchased a 21-foot Mako motor boat. He put title to the boat into his and Stacy's joint names.
Mark also used some of the Jetton house proceeds ($15,000) to make a down payment on two lots on Palm Island, reachable only by boat. He put title to the lots in the parties' joint names with right of survivorship. After the parties' marriage in 1984, Mark and Stacy re-titled the property as tenants by the entireties. They built a $35,000 vacation home on the property, out of available cash or short-term borrowings.
Similarly, after their marriage, Stacy put her Bristol Avenue home into her name and Mark's as tenants by the entireties. It was later sold and the proceeds were used to acquire a jointly-owned house on Bayshore. It was used as their marital residence while the marriage relationship lasted.
Prior to the marriage, Mark also owned a sailboat called the Windvane. He testified his investment in the sailboat was $8,500. In 1985, he placed title to the Windvane in the parties' joint names, and refinanced it. Stacy became liable for the increased debt owed on the sailboat.
In 1987, the parties sold the Windvane. They put $10,500 of the proceeds into acquisition of the Evtide, which was also jointly titled. The Evtide was a classic, vintage sailing vessel, which had fallen into neglect and disrepair. Mark had known the Evtide in her prime, and had sailed with her former owners, while he was growing up and in college.
Mark undertook an extensive restoration of the Evtide, which was not complete at the time the dissolution was filed. It cost some $117,000 of marital funds. At the time of the dissolution hearing, the parties agreed the Evtide was worth $98,000.
Mark relies heavily on the absence in the transcript of any testimony by Stacy that a gift was intended by him to her, of any of these prior owned assets or their proceeds. He testified that all of the transfers into joint names were done for "estate-planning" purposes, or because joint ownership was required by various financiers and mortgagees. Stacy testified that she and Mark put all of their properties in joint names because they regarded all of their assets as owned by both, and they commingled the proceeds from the solely-owned assets with other jointly owned funds.
The trial court denied Mark any special equity in any of these properties. This decision arrives at our court clothed with the presumption of correctness. Gevertz v. Gevertz, 566 So.2d 541 (Fla. 3d DCA 1990); Foust v. Foust, 561 So.2d 589 (Fla. 2d DCA), rev. denied, 564 So.2d 1085 (Fla. 1990); Seijas v. Seijas, 557 So.2d 102 (Fla. 3d DCA 1990); Kirchinger v. Kirchinger, 546 So.2d 86 (Fla. 2d DCA 1989). Only if there is no basis in the record to support Stacy's position on the gift issue, should the appellate court reverse the trial court's finding that tacit joint and mutual gifts were intended by the parties' various transfers *343 into joint names. Howard v. Howard, 467 So.2d 768, 770-772 (Fla. 1st DCA 1985).
Although not necessary to the original three-judge decision on this special equity issue, the original opinion noted that the plain and simple language of section 61.075(3)(a)(5), Florida Statutes (1989), may change the Ball presumption of gift vel non in special equity cases. The statute says:
All real property held by the parties as tenants by the entireties, whether acquired prior to or during the marriage, shall be presumed to be a marital asset. If, in any case, a party makes a claim to the contrary, the burden of proof shall be on the party asserting the claim for a special equity. (emphasis added)
The statute puts the burden on the donor spouse.
The statute could be interpreted as placing the burden of proving no gift was intended on the donor spouse, as opposed to the donee spouse as Ball does. That would put Florida back to the older line of cases prior to Ball. Tiffany v. Tiffany, 305 So.2d 798 (Fla. 4th DCA 1975); Davis v. Davis, 282 So.2d 655 (Fla. 4th DCA 1973). However, we agree final construction of the statute rests with the Florida Supreme Court. But that too is just a matter of time. So far as our research has revealed, no other appellate court has expressly addressed that question, contrary to the assertions by the majority opinion. That is no doubt because the statute is new, and it only applies to cases filed after its effective date: October 1, 1988.[2]
For example, Davis v. Carr, 554 So.2d 669 (Fla. 2d DCA 1990), cited by the majority opinion, was issued January 5, 1990 by the appellate court. The present case was originally released October 11, 1990, and the new statute just barely (a matter of days) applied to it. Miceli v. Miceli, 533 So.2d 1171 (Fla. 2d DCA 1988), also cited by the majority opinion, was issued by the appellate court August 3, 1988. The new statute could not possibly be applicable to Miceli due to the effective date of the statute. Further, if one reads the case it is clear that Miceli involves equitable distribution  not special equity and Ball.[3]
In sum, the special equity disallowance should be affirmed in this case based on the sufficiency of the evidence and the presumption of correctness appellate courts give trial courts.[4] If the new statute[5] changes the Ball presumption, an affirmance is even more strongly indicated.

II. EQUITABLE DISTRIBUTION OF MARITAL ASSETS
The problem in this case is to determine whether the trial court correctly decided what the marital assets were. If its categorization on that score is correct, then the trial court should be affirmed because it divided the marital assets, roughly 50/50 (taking into account the marital debts which either went with the asset or were allotted to Mark).[6] The major argument advanced by Mark was that the trial court erred in determining that all of the appreciation in value of his two interests in real *344 estate partnerships was fairly classified as a marital asset. If the trial court was wrong in this determination, Mark's 50/50 share of the marital assets was substantially reduced, and this cause should be remanded for reconsideration. We would affirm the trial court on this record.[7]
Mark acquired the real estate partnerships shortly before the parties' marriage (about one year) which were formed for the purpose of acquiring old warehouse properties, to hold for speculation with the hope that they would increase in value, due to planned development (known to the partners) in Tampa's downtown area. Mark's interest in the 601 South Florida Avenue warehouse increased in value by $56,825, and his interest in the Harbor Property Associates warehouse increased by $40,899, over the term of the marriage.
The appreciation in value was due to market conditions, but Mark's continued interest in the partnerships was maintained by substantial contributions of marital funds. Mark purchased these partnerships with borrowed funds. The partnerships were highly leveraged and were acquired with over 99% financing. The debt service on the indebtedness was paid by Mark's law firm, Bush Ross, out of the law partnership's funds which otherwise would have been paid to him as a bonus, or as a credit in some other form. The sums were fully taxable to Mark, and he reported them as income on his income tax return. He also took deductions for whatever outlays the tax laws then permitted. A total of $47,000 was paid by Bush-Ross to carry Mark's interest in the 601 partnership, and a total of $14,740 was likewise paid for the Harbor property partnership, over the term of the marriage.
Mark argued that his Bush-Ross partnership predates his marriage to Stacy, and thus the income earned by his interest in the firm remained his sole property. He cited section 61.075(3)(b)3:
All income derived from nonmarital assets during the marriage unless the income was treated, used, or relied upon by the parties as a marital asset.
He points out that the record establishes that the Bush-Ross partnership funds used to pay his share of the principal and interest payments due on the warehouses were never paid to him directly, and thus were not relied upon by Stacy and himself as marital funds.
We do not find this argument persuasive. A law partner's capital account or other passive investment in a partnership may well be a nonmarital asset if acquired prior to marriage. However, an active law partner's share of a law firm's distributions is generally paid to him or her because of that partner's current work efforts and earnings. In this case, Mark made no showing that the taxable income from the law firm, which was used to sustain his interests in the warehouses, was due to a passive investment interest in the law firm. Accordingly, we must assume such payments were primarily, if not solely, due to his work efforts. As such, all the monies used to sustain and carry the warehouse partnerships during the marriage were marital funds. Massis v. Massis, 551 So.2d 587 (Fla. 1st DCA 1989); Turner v. Turner, 529 So.2d 1138, 1141 (Fla. 1st DCA 1988). See Gardner v. Gardner, 452 So.2d 981 (Fla. 5th DCA 1984).
The new equitable distribution statute provides that appreciation in value of non-marital assets (those acquired prior to marriage) may be determined to be a marital asset, to the extent that marital funds or work-efforts contributed to the appreciation. The statute provides that "marital assets" includes:
The enhancement in value and appreciation of nonmarital assets resulting either from the efforts of either party during the marriage or from the contribution to or expenditure thereon of marital funds or other forms of marital assets, or both. (emphasis supplied)
§ 61.075(3)(a)2, Fla. Stat. (1989).
Stacy argued that once some marital funds were shown to have been used to *345 "carry" the debt and carrying charges on the partnership interests based on the threshhold test enunciated by Turner, all of the appreciation of the asset becomes a marital asset. We see no basis in the statute's language to support this "threshhold" test. Pursuant to such a view, a minuscule contribution of marital funds or work effort could transform a substantial appreciation in value of nonmarital property into a marital asset. That makes little common sense given the fact that the Legislature chose to exclude appreciation in value of nonmarital assets during marriage (as a general rule) from the marital asset pile.[8]
The statute expressly uses the phrase "resulting ... from" to describe what appreciation becomes a marital asset. If those words of limitation, as well as description, have any meaning here, then only that appreciation which results from or which was produced by marital funds or work efforts should be included as a marital asset. This requires a trial judge to make a specific allocation in appropriate cases.
Nor do we think the new statute changes the status of Florida's law on this point. No case specifically addresses it. However, the inference from opinions which predate the effective date of section 61.075, point to an allocation approach, rather than a threshold test. In Turner, the court said increases in value "attributable to marital labor and funds," as well as other causes, should apply on remand. Similarly, in Sanders v. Sanders, 547 So.2d 1014 (Fla. 1st DCA 1989), the court remanded for reconsideration of an equitable distribution of marital property that totally excluded the appreciated value of a farm owned by the husband prior to marriage. The court said the increase in value "attributable to" marital funds or work effort, should be apportioned out as a marital asset. (emphasis supplied)
In Miceli v. Miceli, 533 So.2d 1171 (Fla. 2d DCA 1988), the court quoted Turner in reversing an equitable distribution award where it failed to include any appreciation in value of the husband's assets because the court said at least some, and perhaps a substantial portion, was attributable to marital funds and work efforts. That cause was remanded to make appropriate apportionment. Similarly, in Pfleger v. Pfleger, 558 So.2d 198 (Fla. 2d DCA 1990), the court held that a husband could claim as a marital asset the increased value in the wife's home owned prior to marriage, to the extent the increase in the home's value was "attributable to his efforts."[9]
Apportioning the percentage of the appreciation of a nonmarital asset which is fairly attributable to marital funds or marital work efforts is the responsibility of the trial court. Our job as an appellate court is to review that determination using the broad discretionary review and standard outlined by Canakaris. In this case we think the trial court had a basis in the record to determine that all of the appreciation resulted from marital funds and Mark's work efforts in the partnership. This is because the partnership interests were highly leveraged (about equal to the debt owed on them when acquired), they were acquired for investment  speculation, and they were carried and maintained by substantial infusion of marital funds (which largely discharged taxes, interest and other debt service). Wright v. Wright, 505 So.2d 699 (Fla. 5th DCA 1987) is distinguishable from this case because the parties agreed no marital funds or labor contributed to the appreciation in value of the wife's solely-owned asset.
The direction in the majority opinion that on remand the trial court should apply the Landay v. Landay, 429 So.2d 1197 (Fla. 1983) formula, to calculate what percentage of the appreciation should be deemed "marital" and what part "nonmarital" is an innovative approach, but one we think is unwise and unwarranted. In Landay, the problem was allocating the fair amount of *346 a spouse's special equity in a marital asset, when one spouse puts premarital funds or assets into the acquisition or improvement of the asset. To oversimplify somewhat, the original value is equated to 100 percent, and the contributing spouse's share is less than 100%. That ratio is then used to determine the contributing spouse's share of the appreciated total value of the asset.
The application of Landay to this situation is problematical at best. Mark starts with 100 percent and will never take less than 100 percent. How should the trial court handle interest payments, taxes and other carrying charges, which do not reduce the indebtedness owned on the asset but were necessary in order to preserve the ownership of the asset over the time period in which the appreciation occurred? How does the Landay formula take into account intangible factors such as the contribution of a spouse's business judgment to hold an investment for expected appreciation in value?
The answer is that it does not. Landay is strictly a mathematical formula devised by the Florida Supreme Court to value special equities based on an initial investment ratio. It was not designed to attribute portions of the appreciated value of a marital asset resulting from marital work efforts or marital funds, nor can it weigh tangible as well as intangible reasons as is required by the equitable distribution statute. Surely it cannot be as suggested by the majority as simple as calculating the exact amount of principal reduction on the highly-leveraged investments in this case. Thus, we submit the application of Landay to determine what percentage of the appreciation of a nonmarital asset should be a "marital asset" because marital work efforts or funds "contributed" to part or some of the appreciation in this case (as well as in any other) is ill-advised and erroneous.

III. AWARD OF ATTORNEY'S FEES AND COSTS
In the final judgment of dissolution, the trial court reserved jurisdiction to consider and award attorney's fees and costs for the former wife. The attorneys for both parties apparently agreed to address the issue of fees and costs at a later hearing. Following the entry of final judgment, the trial judge was reassigned to the criminal division, and a different judge presided over the fees and costs hearing.
The fees and costs issues were fully litigated at a subsequent, approximately eight-hour hearing. The parties and expert witnesses testified, and the judge considered extensive documentary evidence. Based on that record the trial judge awarded Stacy all of her requested attorney's fees ($71,706.50), and $12,876.32 in costs, and an expert witness fee of $1,950.
The order contains justification for these generous awards:
(1) A great disparity exists in the financial position of Former Husband and Former Wife, in that Former Husband earned in [1989] almost $75,000.00 more than Former Wife, and [he] has assets net of debt that exceeds Former Wife's assets by almost $400,000.00. During the marriage of the parties, Former Husband's income has averaged almost five times that of Former Wife.
(2) [T]his litigation had complex issues of both law and fact involving the valuation of numerous assets and the presenting of significant expert testimony. The matter was extensively litigated by attorneys for both sides. The trial of this case lasted some two and one-half days.
Following the dictates of Standard Guaranty Insurance Co. v. Quanstrom, 555 So.2d 828 (Fla. 1990) and Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985), the court expressly found Stacy's attorneys' hourly rates and hours expended on the law suit to be reasonable.
Mark initially argued that a successor trial judge cannot award attorney's fees under the circumstances as occurred in this case. We reject that view. Attorneys' fees and costs in dissolution cases constitute the kind of issues which may be heard and determined by a successor trial judge in supplemental proceedings. See Batista *347 v. Batista, 553 So.2d 1281 (Fla. 3d DCA 1989). This procedure does not require the successor judge to weigh evidence not presented to him.
In reviewing on appeal an award of attorneys fees and costs, we must accept the trial judge's conclusions or findings which resolve factual matters as true, where there is adequate support for them in the record.[10] We cannot overturn an award of attorneys fees, unless we find an abuse of discretion on the part of the trial judge. Ball v. Ball, 554 So.2d 629 (Fla. 4th DCA 1989); Blankenship v. Blankenship, 502 So.2d 1002 (Fla. 5th DCA 1987); Turney v. Turney, 149 So.2d 83 (Fla. 3d DCA 1963). The trial judge is accorded a large measure of discretion in this area. See Dade County v. Oolite Rock Co., 311 So.2d 699, 706 (Fla. 3d DCA 1975), cert. denied, 330 So.2d 20 (Fla. 1976). Thus we should accept as accurate and fair the trial judge's determination that 240.2 hours in attorney time and 269.9 in paralegal time were reasonably required to represent Stacy in this cause. As the judge noted, this dissolution was "extensively" litigated. The expert witnesses explained that Mark (perhaps because he is himself an attorney) raised numerous special equity claims or valuation issues for almost every asset. It thus became a very complicated case, requiring extensive discovery and generating a high volume of pleadings and correspondence.
Mark also argued that the trial court erred in awarding attorney fees for Stacy's lead counsel at the highest hourly rate in the legal community for dissolution cases. However, the competence, special knowledge, and skill of an attorney are valid factors which should be considered in arriving at a reasonable attorney's fee award.[11] No one questioned that Stacy's legal counsel is at the pinacle of his field. We reject the view that a reasonable fee award requires the trial judge to base his award on the average or mean hourly rate in the legal community.
We next address the question of whether or not the trial judge exceeded his discretion by requiring Mark to pay all of Stacy's reasonable attorney's fees. This requires an examination of the parties' relative financial circumstances.[12] An award of attorney's fees pursuant to section 61.16 is intended to equalize the parties' ability to retain competent representation.[13]
Looking at the equitable distribution award in a light most favorable to Stacy, it appears that she left this four-year, childless marriage, with net assets of approximately $150,000, all of which were marital assets. Mark's post-judgment net assets, totalled approximately $550,000,[14] of which $146,486 were marital assets.[15]
Essentially, the equitable distribution award split the marital assets close to equally. But neither party was given substantial liquid assets because, in fact, they had not acquired any substantial liquid assets during their marriage. Without selling some marital asset awarded, neither party can immediately pay the fees awarded in this case.
*348 Stacy neither sought, nor was awarded, any periodic alimony. She, too, is a practicing attorney. Her current earnings are $54,350 per year. Mark's earnings from his law firm were approximately $113,000 in 1989. There is a disparity in their income earning abilities, but in all candor, not a "huge" one.[16]
Although a party need not be totally destitute and unable to pay his or her own attorney's fees in order to merit such an award,[17] courts should not impose the full brunt of a fee award on one party, if the other spouse receives a relatively equal and substantial split of the marital assets,[18] and if the other spouse also has substantial income or has the financial ability to obtain competent legal counsel without inequitable diminution of that spouse's economic status or security.[19] The Second District has taken a more flexible view[20] of such awards than the Fifth District, which commonly reverses attorney's fee awards in cases similar to this one.[21] Since we are sitting as associate judges for the Second District Court of Appeal, we should not follow the rule developed by the Fifth District cases.
Where it is possible for both spouses to pay some portion of the attorney's fees awarded, as in this case, we think it was an abuse of discretion to impose on Mark the full liability for Stacy's fees.[22] In order to instantly pay her fees, Mark will be required to sell the only substantial marital asset he received: the Evtide. That would distort the equitable distribution award fashioned by the trial court.
Accordingly, we would affirm the trial judge's determination as to the reasonableness of the attorney's fee award, but remand for further consideration of what portion of that award Mark should be required to pay, in view of the parties' relative financial circumstances. In the event Mark cannot meet his obligation to pay his apportioned share of Stacy's fees upfront from his resources, the trial court should consider a scheduled payment plan, at a fair interest rate. See Johns v. Johns, 423 So.2d 443 (Fla. 4th DCA 1982).
GOSHORN and GRIFFIN, JJ., concur.
NOTES
[1] Section 61.075(3)(a)5 states:

(3) As used in this section:
(a) "Marital assets and liabilities" include:
* * * * * *
5. All real property held by the parties as tenants by the entireties, whether acquired prior to or during the marriage, shall be presumed to be a marital asset. If, in any case, a party makes a claim to the contrary, the burden of proof shall be on the party asserting the claim for a special equity.
[2] The trial court found that Straley's non-marital assets in 601 and Harbor Property "accumulated" a value of $56,825.00 and $40,899.00, respectively, during the marriage, and deemed this accumulation, though passive, to be a marital asset.
[1] Rule 4-1.5 sets forth the following eight factors:

(B) Factors to be considered as guides in determining a reasonable fee include the following:
(1) The time and labor required, the novelty, complexity, and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee, or rate of fee, customarily charged in the locality for legal services of a comparable or similar nature;
(4) The significance of, or amount involved in, the subject matter of the representation, the responsibility involved in the representation, and the results obtained;
(5) The time limitations imposed by the client or by the circumstances and, as between attorney and client, any additional or special time demands or requests of the attorney by the client;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, diligence, and ability of the lawyer or lawyers performing the service and the skill, expertise, or efficiency of effort reflected in the actual providing of such services; and
(8) Whether the fee is fixed or contingent, and, if fixed as to amount or rate, then whether the client's ability to pay rested to any significant degree on the outcome of the representation.
[1] Ball v. Ball, 335 So.2d 5 (Fla. 1976).
[2] § 61.075, Fla. Stat. (Supp. 1988).
[3] Similarly, cases from the other districts cited by the majority do not reference the new statute, and because of their dates of issuance, it is more probable than not that the new statute was not applicable. See Martinez v. Martinez, 573 So.2d 37 (Fla. 1st DCA 1990) (involved a gift from third parties, not a spouse; thus Ball not involved); Robertson v. Robertson, 569 So.2d 852 (Fla. 4th DCA 1990); (decided by appellate court December 10, 1990); Milton v. Milton, 567 So.2d 477 (Fla. 1st DCA 1990) (decided by appellate court September 7, 1990); Hoffman v. Hoffman, 552 So.2d 958 (Fla. 1st DCA 1989) (decided by appellate court November 18, 1989; special equity not involved in case); Della-Giustina v. Della-Giustina, 546 So.2d 1146 (Fla 4th DCA 1989) (decided by appellate court July 1989; special equity not an issue in case); Rouer v. Rouer, 548 So.2d 848 (Fla. 3d DCA 1989) (decided by appellate court September 1989; a P.C.A. merely citing Ball and Canakaris).
[4] Mann v. Mann, 578 So.2d 395 (Fla. 3d DCA 1991); Wolfson v. Cary, 488 So.2d 864 (Fla. 3d DCA 1986); Rabben v. Rabben, 468 So.2d 500, 501 (Fla. 5th DCA 1985).
[5] § 61.075(3)(a)3, Fla. Stat. (1989).
[6] Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980).
[7] Warner v. Sony Corp. of America, 560 So.2d 399 (Fla. 4th DCA 1990); Cunningham v. Anchor Hocking Corp., 558 So.2d 93, 96 (Fla. 1st DCA), rev. denied, 574 So.2d 139 (Fla. 1990); Hutchinson v. Miller, 548 So.2d 883, 884 (Fla. 5th DCA 1989).
[8] § 61.075(3)(b), Fla. Stat. (1989).
[9] See also Keller v. Keller, 521 So.2d 273 (Fla. 5th DCA 1988) (court held appreciated value of restaurant could be a marital asset to the extent marital funds or work efforts contributed to the increased value, and remanded to lower court to make that determination.)
[10] Conner v. Conner, 439 So.2d 887 (Fla. 1983); Lodding v. Dunn, 251 So.2d 560 (Fla. 3d DCA 1971), cert. denied, 258 So.2d 818 (Fla. 1972).
[11] Fla.Bar Rule 4-1.5(B)(7); Hall v. Hall, 200 So.2d 544 (Fla. 3d DCA 1967) quoting Provus v. Provus, 44 So.2d 656 (Fla. 1950).
[12] Hudgens v. Hudgens, 411 So.2d 354 (Fla. 2d DCA 1982).
[13] Smith v. Smith, 495 So.2d 229 (Fla. 2d DCA 1986); Mertz v. Mertz, 287 So.2d 691 (Fla. 2d DCA 1973); Silberman v. Katcher, 214 So.2d 726 (Fla. 3d DCA 1968).
[14] The record reveals that Mark owned a 6.625 percent interest in Harbor Properties. Harbor was valued at $125 per square foot for a total of 21,940 square feet, or $2,742,500. Mark's total interest was therefore $181,690.62 ($2,742,500 X.06625). The trial court found the marital portion to be $40,899; the nonmarital portion would be $140,791.62. Likewise Mark owned a one-sixth interest in 601 South Franklin. 601 was valued at $120 per square foot for 15,700 square feet, or a total of $1,884,000. Mark's total interest was therefore $313,874.40 ($1,884,000 X .1666). The trial court found the marital portion to be $56,825; thus the nonmarital portion was $257,049.40.
[15] He was awarded $257,492 in marital assets, but was also required to pay $111,000 in marital debts.
[16] Compare Hudgens v. Hudgens, 411 So.2d 354 (Fla. 2d DCA 1982) (husband earned over $100,000 per year; wife earned $14,000 per year).
[17] Turney v. Turney, 149 So.2d 83 (Fla 3d DCA 1963).
[18] Martinez-Cid v. Martinez-Cid, 559 So.2d 1177 (Fla. 3d DCA 1990); Garrett v. Garrett, 559 So.2d 613 (Fla. 3d DCA 1990).
[19] Lewis v. Lewis, 485 So.2d 855 (Fla. 2d DCA 1986); Lyons v. Lyons, 436 So.2d 156 (Fla. 2d DCA 1983) (no award of attorney's fees where parties had substantially similar abilities to secure competent legal counsel).
[20] See Lochridge v. Lochridge, 526 So.2d 1010 (Fla. 2d DCA 1988); Blackburn v. Blackburn, 513 So.2d 1360 (Fla. 2d DCA 1987).
[21] See Beaver v. Beaver, 500 So.2d 742 (Fla. 5th DCA 1987); Mauldin v. Mauldin, 493 So.2d 1103 (Fla. 5th DCA 1986); Sizemore v. Sizemore, 487 So.2d 1080 (Fla. 5th DCA 1986).
[22] See O'Steen v. O'Steen, 478 So.2d 489 (Fla. 1st DCA 1985) (where parties split the marital assets equally, and there was a substantial disparity in their incomes, the trial court correctly awarded the wife a part of her attorney's fees).